Slip Op. 18-24

### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **ITOCHU BUILDING PRODUCTS CO., INC., TIANJIN JINCHI METAL PRODUCTS CO., LTD., TIANJIN JINGHAI COUNTY HONGLI INDUSTRY & BUSINESS CO., CERTIFIED PRODUCTS INTERNATIONAL INC., CHIIEH YUNGS METAL IND. CORP., HUANGHUA JINHAI HARDWARE PRODUCTS CO., LTD., SHANGDONG DINGLONG IMPORT & EXPORT CO., LTD., TIANJIN ZHONGLIAN METALS WARE CO., LTD., HENGSHUI MINGYAO HARDWARE & MESH PRODUCTS CO., LTD., HUANGHUA XIONGHUA HARDWARE PRODUCTS CO., LTD., SHANGHAI JADE SHUTTLE HARDWARE TOOLS CO., LTD., SHANGHAI YUEDA NAILS INDUSTRY CO., LTD., SHANXI TIANLI INDUSTRIES CO., LTD., CHINA STAPLE ENTERPRISE (TIANJIN) CO., LTD., QIDONG LIANG CHYUAN METAL INDUSTRY CO., LTD., ROMP (TIANJIN) HARDWARE CO., LTD., CYM (NANJING) NINGQUAN NAIL MANUFACTURE CO., LTD. a/k/a CYM (NANJING) NAIL MANUFACTURE CO., LTD., SHANXI PIONEER HARDWARE INDUSTRIAL CO., LTD., and MINGGUANG ABUNDANT HARDWARE PRODUCTIONS CO., LTD.,** | **Before: Jane A. Restani, Judge**<br><br>**Consol. Court No. 12-00065**<br><br>**PUBLIC VERSION** |
| Plaintiffs, | |
| **THE STANLEY WORKS (LANGFANG) FASTENING SYSTEMS CO., LTD., and STANLEY BLACK & DECKER, INC.,** | |
| Consolidated Plaintiffs, | |
| v. | |

| UNITED STATES, |
| --- |
| Defendant, |
| **MID CONTINENT NAIL CORPORATION,** |
| Defendant-Intervenor. |

## OPINION

[Commerce's remand redetermination results in its administrative review of an antidumping duty covering steel nails from China are sustained.]

Dated:  March 22, 2018

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for plaintiffs.  With him on the brief were Bruce M. Mitchell, Mark E. Prado, and Dharmendra N. Choudhary.

Lawrence J. Bogard, Neville Peterson, LLP, of Washington, DC, for consolidated plaintiffs.

Tara K. Hogan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Sosun Bae, Trial Attorney.  Of counsel on the brief was Jessica DiPietro, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Adam H. Gordon, The Bristol Group PLLC, of Washington, DC, for defendant-intervenor.  With him on the brief was Ping Gong.

**Restani, Judge**:  Before the court is the U.S. Department of Commerce ("Commerce")'s

Final Results of Redetermination Pursuant to Itochu Building Products Co., Inc., et al v. United

States, ECF No. 163 ("Remand Results"), concerning the second administrative review, for the

period August 1, 2009, through July 31, 2010 ("POR"), of the antidumping ("AD") order on

certain steel nails from the People's Republic of China ("PRC").  See Certain Steel Nails From

the People's Republic of China: Final Results of the Second Antidumping Duty Administrative

Review, 77 Fed. Reg. 12,556 (Dep't Commerce Mar. 1, 2012) ("Final Results").[1]   For the

reasons stated below, Commerce's Remand Results are sustained.

## BACKGROUND

The court assumes that all parties are familiar with the facts of the case as discussed in

Itochu Building Products Co., Inc., et al., v. United States, Slip Op. 17-73, 2017 WL 2703810, at

*1–*4 (CIT June 22, 2017) ("Itochu").   For the sake of convenience, the facts relevant to this

remand are summarized herein.   In the Final Results, Commerce calculated the surrogate value

("SV") of steel plate using GTA India data because it found Joint Plant Committee ("JPC") data

from India to be less suitable for valuing the factors of production ("FOPs") for steel plate.[2]

Certain Steel Nails from the People's Republic of China:  Issues and Decision Memorandum for

the Final Results of the Second Antidumping Duty Administrative Review, A-570-909, POR

08/01/2009-07/31/2010, at 24–25 (Dep't Commerce Feb. 23, 2012) ("I&D Memo").   Commerce

also decided to use financial statements from Sundram Fasteners Limited ("Sundram"), and

Bansidhar Granites ("Bansidhar"), to calculate surrogate financial ratios for steel nails because

the other financial statements on record were either not contemporaneous with the POR, or were

---

[1] This matter was transferred to the current judge on March 20, 2017.  Order of Reassignment, ECF No. 140.

[2] Because Commerce considers the PRC a non-market economy ("NME"), Commerce creates a hypothetical market value for steel nails in conducting its review.  See Downhole Pipe & Equip. LP v. United States, 887 F. Supp. 2d 1311, 1320 (CIT 2012) (citing Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999)).  To construct such a value, Commerce relies on data from a market economy or economies to provide surrogate values for the various factors of production used to manufacture the subject merchandise.  See 19 U.S.C. § 1677b(c)(1)(B).  In addition, Commerce uses financial statements from producers of identical or comparable merchandise to yield surrogate financial ratios to calculate general expenses for inclusion in normal value.  See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 366 F. Supp. 2d 1264, 1277 n.7, 29 CIT 288, 303 n.7 (2005).

known to include countervailable subsidy data.  Id. at 11–15.  Commerce requested remand, however, to reevaluate whether Sundram's financial statements included countervailable subsidies.  Itochu at *9.  Lastly, Commerce applied AFA instead of neutral facts available in lieu of data sought from Jinchi's unaffiliated suppliers when Jinchi was unable to obtain the supplier's financial information requested.  I&D Memo at 26-28.

On June 22, 2017, the court remanded the case to Commerce.  Itochu at *17.  The court ruled that:  (1) Commerce's decision to use Global Trade Atlas ("GTA") India data as the surrogate value ("SV") for steel plate was unsupported by substantial evidence, id. at *8; (2) Commerce's request for remand with regard to Sundram's financial statements was justified and appropriate, and thus approved, id. at *9; and (3) Commerce erred when it applied adverse facts available ("AFA") to Tianjin Jinchi Metal Products Co., Ltd. ("Jinchi"), id. at *16.  The court also directed Commerce and the defendant-intervenor, Mid-Continent Nail Corporation ("Mid-Continent"), to address whether Mid Continent affected AD margins by accepting any payments to withdraw its requests for an administrative review of 160 companies, and if so, whether this was proper.  Id. at *17.

On remand, Commerce reconsidered its evaluation of certain SV data, namely GTA India data for steel plate prices and Sundram's financial statements for financial ratios.  Based on the record data, Commerce decided to value steel plate using JPC data from India, Remand Results at 3–13, and found that Sundram's financial statements constitute the best record information for financial ratio purposes, id. at 14–26.  In addition, Commerce revisited its application of AFA to missing FOP data for Jinchi's unaffiliated masonry nails supplier, and determined to apply neutral facts available.  Id. at 26–34.  Further, Commerce addressed the court's questions and Mid Continent's responses regarding Mid Continent's withdrawal of review requests in this

Case 1:12-cv-00082-JAR   Document 41   Filed 03/22/18   Page 5 of 22

PUBLIC OPINION
Consol. Court No. 12-00065                                                              Page 5

administrative review, finding no improper conduct.  Itochu at *6, *17; Remand Results at 34–39; Certain Steel Nails from the People's Republic of China: Response to Questions Posed in Court Order in Itochu Building Prods., et al. v. United States, Consol. Ct. No. 12-00065, Slip Op. 17-73 (June 22, 2017), A-570-909, POR 08/01/2009-07/31/2010, at 11 (July 14, 2017) ("Mid Continent Withdrawal Letter").

Consolidated Plaintiffs ("Plaintiffs")[3] challenge Commerce's continued reliance on Sundram's financial statements as a source for calculating surrogate financial ratios for steel nail production.  Plaintiffs' Comments on Final Results of Redetermination, ECF No. 169, at 8–32 ("Pl. Cmts.").  Mid Continent challenges Commerce's use of JPC India data as a SV for steel plate and its application of neutral facts available to Jinchi, arguing Commerce misinterpreted of the court's instructions.  Comments of Defendant-Intervenor Mid Continent Nail Corporation on Final Results of Redetermination Pursuant to Court Remand, ECF No. 166, at 3–12 ("Def.-Int. Cmts.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court upholds Commerce's final results in an antidumping duty review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"   19 U.S.C. § 1516a(b)(1)(B)(i).

---

[3] The Plaintiffs included in this challenge are Itochu, Jinchi, The Stanley Works (Langfang) Fastening Systems Co., Ltd. ("Stanley"), and Tianjin Jinghai County Hongli Industry & Business Co. ("Hongli").

## DISCUSSION

### I.   Mid Continent's Withdrawal of Review Requests

In <u>Itochu</u>, the court expressed concerns that Mid Continent may have improperly affected antidumping margins by accepting payments in exchange for withdrawing its administrative review request vis-à-vis 160 of the original 222 companies.  <u>Itochu</u> at *5.  The court directed Mid Continent to provide a written response to Commerce addressing these concerns, specifically asking why such a broad review was initially ordered and whether payments were exchanged for the later withdrawal of the review request.  <u>Id.</u> at *6.

In Mid Continent's written response to Commerce, Mid Continent stated as an initial matter that it acted within Commerce's regulations in withdrawing its requests for review of certain Chinese producers and/or exporters of subject merchandise.  Mid Continent Withdrawal Letter at 8.[4]  Mid Continent indicated that its decision to withdraw the requests was based on the particular facts of the case, as it knew them.  <u>Id.</u> at 11.  Most significantly, Mid Continent asserted that:  "No payments were made in exchange for the withdrawal of the requests."  <u>Id.</u>

Commerce did not have additional evidence to contradict Mid Continent's responses and, therefore, determined that no further investigation was warranted.  <u>Remand Results</u> at 38–39. This result is not challenged and is sustained.

---

[4] <u>See</u> 19 C.F.R. § 351.213(d)(1):  "The Secretary will rescind an administrative review under this section, in whole or in part, if a party that requested a review withdraws the request within 90 days of the date of publication of notice of initiation of the requested review.  The Secretary may extend this time limit if the Secretary decides that it is reasonable to do so."

## II.   Commerce Properly Relied on JPC Data to Value Steel Plate[5]

In <u>Itochu</u>, the court found Commerce's selection of GTA India import data was unsupported by substantial evidence.  <u>Itochu</u> at *7.  The court noted that GTA India price data was not close to the levels of other data and concluded that Commerce failed to consider the reliability of GTA India data in the light of other data sources, and further failed to address evidence suggesting that price does not correlate to steel plate thickness in the range at issue.  <u>Id.</u> at *8.  Accordingly, the court instructed Commerce to:  (1) consider whether other record data sources rendered GTA India import data unreliable; and (2) explain what record evidence supports Commerce's decision to disregard available surrogate data for varying thicknesses of steel plate.  <u>Id.</u>

On remand, Commerce apparently interpreted the court's "unsupported by substantial evidence" holding to mean that GTA India data must not be used for either the SV or for benchmarking analysis.  <u>Remand Results</u> at 11.  The court stated, rather, that the reliability of Commerce's selected surrogate value was called into question, and directed Commerce to assess the other record data sources and explain what evidence supports its decision.  <u>Itochu</u> at *8. Commerce nonetheless considered the other potential data sets and decided to use JPC India data because it has the next-highest contemporaneity at eight months of the POR and comes from the primary surrogate country, India.  <u>Remand Results</u> at 11–13.  <u>Second Pre-Prelim Surrogate Value Rebuttal Submission for GDLSK Respondents' in the Second Administrative Review of Certain Nails from the People's Republic of China</u>, A-570-909, POR 08/01/2009-07/31/2010, at Ex.2L (Dep't Commerce June 24, 2011) ("Itochu SV Submission").  Steelworld data for India

---

[5] Although the three mandatory respondents consumed steel wire rod in their production of steel nails, <u>see</u> <u>I&D Memo</u> at 15, Commerce selected a surrogate value for cut steel plate, which is the main input of the cut plate masonry nails purchased by Hongli from one of its suppliers, <u>id.</u> at 24.

covered only six months of the POR.  Itochu SV Submission at Ex.2N.  The other data sets were used only for benchmarking or corroboration purposes.  Remand Results at 5–6.  No party disputes the selection of JPC over Steelworld data.

Without conceding that GTA India data are aberrational, or otherwise not probative, Commerce identified a different data set in India JPC that conforms to the "best available information" criteria.  Remand Results at 13, citing, e.g., Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review, 71 FR 40477 (July 17, 2006) and accompanying Issues and Decision Memorandum at Comment 1.  Despite Commerce's seemingly misguided interpretation of the remand directive, its use of JPC data is supported by substantial evidence.

A.  **Analysis of Surrogate Valuation Factors for Steel Plate**[6]

When determining which SV data set to use, Commerce selects the "best available information," guided by the following factors:  (1) public availability; (2) contemporaneity with the POR; (3) representativeness of a broad market range; (4) location in an approved surrogate country; (5) tax and duty-exclusivity; and (6) specificity to the output.  Remand Results at 12-13, citing, e.g., Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products from the People's Republic of China, 71 FR 53079 (September 8, 2006) and accompanying Issues and Decision Memorandum at Comment 3.  .  Commerce uses whichever data set satisfies the "breadth of the aforementioned selection criteria."  Id. at 13.  The specificity and representativeness factors are the focus of the remand redetermination.

---

[6] Confidential information within double brackets has been omitted.

Commerce initially decided against using JPC data primarily because the data were said to be sourced from "significantly thicker cut steel plate than what Hongli's[7] supplier used." I&D Memo at 25.   Commerce contended that steel thickness was crucial to specificity.   See id.

Plaintiffs submitted ten other data sets to demonstrate that:  (1) the thickness of steel did not affect the price; and (2) that JPC's data were more appropriate than GTA India's data.  JPC's data were within the range of the other sets even though JPC prices covered thicker steel.[8] Itochu SV Submission at Ex.2A–Ex.2N.  In the I&D Memo, Commerce summarily rejected the probative value of these additional data sets, and refused to consider this evidence against Commerce's apparent conclusion that steel thickness corresponds to price, even within the ranges of thickness at issue.  I&D Memo at 25.[9]  The court, however, concluded that these data

---

[7] Hongli is one of the mandatory respondents examined in the administrative review at issue. I&D Memo at 1, n.2.  The steel plate its supplier used was in the [[          ]] range.  Second Administrative Review of Certain Nails from the People's Republic of China:  Factors of Production for certain nails exported by Hongli which were produced by [[

          ]], A-570-909, POR 08/01/2009-07/31/2010, at Ex.5 (Dep't Commerce Sept. 28, 2011).

[8] The data sets which Plaintiffs submitted all showed price points between USD $0.683/kg and USD $0.7840/kg, despite the steel covered by those data sets varying in thickness from 3 to 25mm.  Itochu SV Submission at Ex.2A (showing steel plate prices).  See also, e.g., id. at Exs.2D and 2E (containing German export data, corresponding to price number two in Ex.2A, for steel of thickness between 3 and 4.75mm (Ex.2D), and greater than or equal to 3mm (Ex.2E)), 2L (containing JPC data, corresponding to price number eight in Ex.2A, for steel between 6 and 25mm thick).  GTA India's data shows a value of $1.68/kg for steel plate, id. at Ex. 2C, while JPC data shows a value of $0.78/kg for 6 to 25mm thick steel plate, id. at Ex.2L.

[9] On remand, Commerce noted that it finds the submitted data sets not probative, stating that it prefers "POR-specific GTA data for the countries on the surrogate country list" when "evaluating whether GTA data for a specific country is aberrational" (emphasis added).  Remand Results at 5, 11.  Commerce did not address precedent stating that "export data from countries that were not potential surrogates" may be "sufficient to call into question the reliability of the [selected surrogate] data."  Itochu at *8 (citing Xinjiamei Furniture (Zhangzhou) Co. v. United States, 2013 WL 920276, at *3, *6 (CIT Mar. 11, 2013)).  Further, the one country on the SV list, the Philippines, had even lower steel plate values.  Itochu SV Submission at Ex.2H.

sets were in fact probative and should be considered.  Itochu at *8.  In spite of Commerce's

reluctance, its use of JPC data on remand is supported by substantial evidence.  JPC data satisfy

the main factors evaluated in selecting an SV.  Commerce's first choice for a steel plate SV was

GTA India data, because the data are allegedly more specific to Hongli's product, in addition to

being tax-exclusive, publicly available, contemporaneous with the POR, and represented imports

into the principal surrogate country, India.  I&D Memo at 25.  GTA India data, however, has an

extremely narrow base, as it covers imports only from one highly developed steel-producing

country. [10] See id.

Commerce's main argument against using JPC data[11] was that it was not sufficiently

specific.[12]  Id.  It is not clear that the difference in plate thickness, within the range at issue, is

important; it does not seem to affect price.  See, supra, note 8.  Commerce did acknowledge that

JPC data satisfied the other five "best available information" factors, determining that the data

were publicly available, presented a broad market average, were tax-exclusive, contemporaneous

---

[10] GTA India includes only prices of imports from Germany.  See Itochu SV Submission, at
Ex.2C.  The high price may indicate it is for specialty steel, as record data covering German steel
plate exports more generally indicates an average price of $0.769/kg.  See id. at Ex.2D and
Ex.2E.

[11] The JPC data is derived from India domestic price data.  Second Antidumping Administrative
Review and New Shipper Review of Certain Steel Nails from the People's Republic of China:
Surrogate Values ("SVs") for the Preliminary Results, A-570-909, POR 08/01/2009-07/31/2010,
at 4 (Dep't Commerce Aug. 31, 2011) ("Prelim. SVs").  It covers steel plate imports, regardless
of origin, cleared through the cities of Kolkata, Delhi, Mumbai and Chennai.  Itochu SV
Submission, at Ex.2L.

[12] Whether or not rerolling takes place at Hongli, or its supplier, the court has previously
accepted Commerce's view that specificity based on metal material size can be less important
than other factors when selecting SV for nails.  See Itochu Building Products Co. Inc. v. United
States, 2018 WL 467986, at *6 (CIT Jan. 18, 2018). ("the diameter of the wire rod may change
throughout the production process… [so] Commerce's determination that the mutability of the
wire rod input and substitutability of stock of different diameters lessens the importance of
diameter, is adequately supported.").

with the POR, and from the primary surrogate country.   I&D Memo at 24.   On remand,
Commerce determined JPC data were the appropriate SV data set, but did so under protest, and
without conceding that JPC data were the most representative data set on record, under the "best
available information" criteria.   Remand Results at 13.

There is no disagreement that GTA India data and JPC data are publicly available,
contemporaneous, tax and duty exclusive, and from the surrogate country.   The substantially
higher price of steel in GTA India data (aberrational or not),[13] combined with the fact that GTA
India only covers imports from Germany, however, indicates that GTA India data are not
representative of a broad market average, at least in the sense of source.   Commerce offered no
evidence to support its previous conclusion that plate thickness should be the controlling factor
and no party cites to evidence that would demonstrate this.   Furthermore, if Commerce was
dissatisfied with the record data sets that demonstrated the reliability of JPC figures and the
unreliability of GTA figures, it was free to reopen the record.   If there were a reason why GTA
India's very high value was plausible as a SV for steel plate here, despite the much lower values
on record from developed and non-developed countries, that information was not on this record.

While Commerce's belief that the court ordered it to choose a data set other than GTA
India was misguided, its final choice of JPC data is supported on this record as it satisfies
Commerce's normal criteria and falls within a plausible price range.   There is no reason to

---

[13] In Itochu, the court directed Commerce to address Plaintiffs' evidence that GTA India's data
are aberrational.   Id. at *8.   Commerce, however, simply noted that it "reviews any disparities on
a case-by-case basis" and that the SV must be "substantially higher than the benchmark data on
the record" in order to be considered aberrational.   Remand Results at 5.   In other words, it did
not acknowledge that the record data indicates a narrow range of low steel prices from various
sources, except for the much higher GTA India price data.

remand this matter, as requested by Mid Continent, as on this record GTA India is a flawed choice and Commerce's analysis supporting its new selection is sufficient.

### III.   Commerce Reasonably Selected Sundram's Surrogate Financial Statements

The court granted Commerce's request for a remand to reconsider whether it had reason to suspect or believe that Sundram received countervailable subsidies, so that its financial statements[14] would not provide useful surrogate value data.   Itochu at 23.   On remand, Commerce reexamined its decision to use Sundram as one of the market economy ("ME") surrogate companies despite the fact that Sundram:  (1) was located and operated in a Special Economic Zone ("SEZ"); and (2) qualified to receive special tax incentives under Section 35(2AB) of India's Income Tax Act.   Remand Results at 14–15.   Commerce determined that it was "appropriate to rely on Sundram's financial statements," because while Sundram was eligible for subsidies, there was no evidence showing that Sundram actually benefitted from them.  Id. at 18.

In response to the Remand Results, Plaintiffs argue that Commerce's analysis of the subsidies was "directly contrary to controlling law and not supported by substantial record evidence."  Pl. Cmts. at 8.  Plaintiffs contend that Commerce "impermissibly conflated a rigid test" by not correctly applying the "'reason to believe or suspect' standard." Id. at 9.  Further, Plaintiffs argued that the evidence suggests Sundram did in fact benefit from subsidies based on the SEZ and Income Tax Act, and thus Commerce erred in using Sundram as a surrogate.  Id.  at 15–24. Plaintiffs also argue that Sundram did not produce comparable merchandise.  Id. at 24– 32.  Plaintiffs nevertheless failed to demonstrate that Commerce's evaluation was unreasonable,

---

[14] Financial statements are used to calculate surrogate financial ratios.  Prelim. SVs at 16.

Case 1:12-cv-00082-JAR   Document 41   Filed 03/22/18   Page 13 of 22

PUBLIC OPINION
Consol. Court No. 12-00065                                    Page 13

particularly in the light of Commerce's thorough consideration of the other potential surrogate

sources for financial ratios.  I&D Memo at 10-15.[15]

### A.  Special Economic Zone

To determine whether Sundram received subsidies, Commerce turned to the financial

statements provided by Sundram and considered whether the financial statement contained more

than "a mere mention that a subsidy was received."  Remand Results at 16 (citing Clearon Corp.

v. United States, 800 F. Supp. 2d 1355, 1358–59 (CIT 2011); Catfish Farmers of Am. v. United

States, 641 F. Supp. 2d 1362, 1379–80, 33 C.I.T. 1258, 1275–76 (2009)).  The "mere fact" a

company is located in an Indian SEZ "does not suggest receipt of a specific subsidy" on its own,

because "benefits from India's SEZ programs are not provided automatically to companies

located within the SEZ."  Id. at 17.

While Plaintiffs argued there was "substantial record evidence" showing Sundram

benefitted from India's SEZ Act, the evidence cited was based on generalities about the SEZ

Act, and did not demonstrate that Sundram benefitted from the subsidies.  Pl Cmts. at 16–17

(citing  Certain Steel Nails from the People's Republic of China:  Submission of Surrogate

---

[15] According to the I&D Memo, the record originally contained five financial statements: (1) Bansidhar 2009-2010; (2) J&K 2008-2009; (3) Nasco 2008-2009; (4) Sundram 2009-2010; and (5) Lakshmi 2009-2010, all of which Commerce considered thoroughly.  I&D Memo at 11.  In the Preliminary Results, Commerce averaged the financial ratios of Bansidhar, Nasco, and J&K, to obtain the surrogate financial ratios.  Id.  Commerce did not use the J&K and Nasco statements for the Final Results because the financial statements from J&K and Nasco covered fiscal periods prior to the POR.  Id. at 12.  Also, Commerce reviewed the financial statements for Lakshmi and determined that it received countervailable subsidies during the POR under programs previously investigated by Commerce. As a result, Commerce did not use the financial statement of Lakshmi either.  Id. at 11–12.  The two remaining financial statements were Bansidhar and Sundram. Both statements were for periods that overlap the POR.  Id. at 12.  For the Final Results, Commerce averaged the financial statements for Bansidhar and Sundram, finding they represented the best available information on the record for calculating financial ratios.  Id. at 14.

Values by Mid Continent Nail Corp., A-570-909, POR 08/01/2009-07/31/2010, at Ex.1, pages 9, 11, 33 (Dep't Commerce Oct. 13, 2011) ("Mid Continent SV Submission"); Certain Steel Nails from the People's Republic of China,  Second Administrative Review; [Stanley's] Comments Regarding Petitioner's Surrogate Value Submission for the Final Results, A-570-909, POR 08/01/2009-07/31/2010, at Ex.5B (Dep't Commerce Oct. 24, 2011)).  Furthermore, companies in the SEZ "must commit to export their production of goods and/or services," Defendant's Response to Parties' Comments Upon the Department of Commerce's Remand Results, ECF No. 173, at 22 ("Commerce Response") (quoting Issues and Decision Memorandum for the Final Results of the Countervailing Duty New Shipper Review of Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India, C-533-825, NSR: 01/01/2009-12/31/2009, at 13 (Dep't Commerce May 27, 2011) ("PET Film I&D Memo")), and that "in certain instances, a company must also apply and qualify for the benefits of the subsidy programs to receive them," Remand Results at 17 (citing PET Film I&D Memo at 13–19).  The record does not indicate that either of these prerequisite actions were taken in this case.  Accordingly, Commerce's determination as to the SEZ was substantially supported and the court sees no indication that legal standards were not properly applied as to the SEZ determination.

### B.  Section 35(2AB) of India's Income Tax Act

On remand, Commerce reexamined whether it had reason to suspect or believe that Sundram actually received countervailable subsidies in the light of an EU decision finding Section 35(2AB) of India's Income Tax Act countervailable.   Remand Results at 18.[16] Commerce, however, did not find any indication that Sundram "was approved or specifically

---

[16] Commerce originally mistakenly stated that the EU had not made such a determination.  I&D Memo at 12 n.25.  That conclusion, however, was incorrect.  Itochu at *9.

received benefits from any programs related to Section 35(2AB)." Id.   While the financial statements mention Sundram's eligibility for the subsidies in question, Commerce found "no corresponding line item demonstrating that Sundram received any subsidies." Id.  Plaintiffs have supplied no such evidence.

Nevertheless, Plaintiffs contend that Fuyao Glass Industry Group Co. v. United States, requires Commerce to "demonstrate . . . it would have been unnatural for a supplier to not have taken advantage of such subsidies."  Pl. Cmts. at 24 (quoting 29 C.I.T. 109, 118 (2005)). Further, Plaintiffs argue that "like any other prudent business person, Sundram would have availed subsidy benefits pursuant to Section 35(2AB)."  Pl. Cmts. at 24.  Commerce counters that plaintiff's proffered approach is but one way of assessing the evidence of subsidies. Commerce Response at 20 (citing Gold East Paper (Jiangsu) Co. Ltd. V. United States, 121 F. Supp. 3d 1304, 1307–08 (CIT 2015)).  In the course of its discussion on subsidies, Fuyao does not address the special problems presented by the use of bald financial statements, from which Commerce derives ratios for overhead, selling, general, and administrative expenses.  See 29 C.I.T. at 111 –119.  This is necessarily an inaccurate process.  Here, Commerce reviewed the instant record and evaluated the four corners on the financial statements, because that was the only evidence generally available during the POR.  See Commerce Response at 23.  Given the limited choices available to Commerce on remand and the potential for further inaccuracy stemming from the use of just one financial statement, Commerce's decision not to reject Sundram's statement on this basis and its averaging approach were reasonable here.  The court finds Commerce's decision adequately supported.

Case 1:12-cv-00082-JAR   Document 41   Filed 03/22/18   Page 16 of 22

PUBLIC OPINION
Consol. Court No. 12-00065                                                    Page 16

## C. Comparable Merchandise

On remand, once Commerce determined that Sundram's financial statements were acceptable surrogates, based on a lack of demonstrable receipt of subsidies, it addressed Itochu and Stanley's concerns regarding whether Sundram produces comparable merchandise. Remand Results at 19–23. In doing so, Commerce considered three factors: (1) physical characteristics; (2) production process; and (3) end uses. Id. at 19.

As to physical characteristics, Commerce found nails and screws comparable because they are "both made from steel [and] have a shank and head." Id. at 20 (citing Mid Continent SV Submission at Ex.10-1, pages 5–6 ("Certain Steel Nails from the UAE") and Ex.10-2, page 8 ("Certain Fasteners from China and Taiwan")). Both the NME producer's nails and Sundram's screws were made from steel wire rod ("SWR"). Mid Continent SV Submission at Ex.6 (regarding Sundram's use of SWR); I&D Memo at 14 (regarding respondents' use of SWR). Plaintiffs argue the SWR used for making automotive fasteners is "high tensile" as compared to the "low-carbon and medium-carbon" SWR used for producing nails, and that this physical distinction renders the products incomparable for SV purposes. Pl. Cmts. at 29. Plaintiffs, however, do not provide any actual evidence of specific "chemical, physical, or mechanical" differences between the two types of steel. Id. (quoting Remand Results at 22). Instead, Plaintiffs merely argue that the two are "prima facie different." Id. Plaintiffs also "ignore record evidence that demonstrates . . . that Sundram produces other fasteners in addition to automotive fasteners," Commerce Response at 26; see Mid Continent SV Submission, at Ex.2, pages 3–4, which indicates that at least some of Sundram's fasteners are even more comparable to the NME producer's product.

Case 1:12-cv-00082-JAR   Document 41   Filed 03/22/18   Page 17 of 22

**PUBLIC OPINION**
Consol. Court No. 12-00065                                                                 Page 17

As to the production processes, Commerce found them comparable for both nails and automotive fasteners because they are both "produced from steel wire and rod," "produced using cold forming machines" and "subject to . . . head treatment and coating." Remand Results at 21–23 (citing Certain Steel Nails from the UAE at I-9–I-10, and Certain Fasteners from China and Taiwan at 10). Commerce noted that it is "not required to 'duplicate the exact production experience'" when comparing the NME producer to Sundram. Id. at 22 (quoting Issues and Decision Memorandum for the Final Determination in the Less Than Fair Value Investigation of Certain Oil Country Tubular Goods from the Peoples' Republic of China, A-570-943, POI: 10/01/08-03/31/09, at Comment 13 (Dep't Commerce Apr. 19, 2010)). Plaintiffs argue that "Sundram undeniably utilizes sophisticated manufacturing processes for producing specialized auto components including fasteners," Pl. Cmts. at 26 (emphasis added); however, Plaintiffs fail to provide any evidence for this claim, other than suggesting Sundram uses a "prima facie different" high tensile steel, id. at 29. The court agrees with Commerce that although certain stages in the production process may differ, if overall the processes are similar, this does not necessarily weigh against comparability. See Remand Results at 22–23.

Finally, Commerce found that the end uses of both products were sufficiently comparable for its purposes. In prior cases, Commerce defined the end use of a nail as, "holding separate pieces together," Certain Steel Nails from the UAE at I-6, and the end use of a screw as, "hold[ing] [and] join[ing]… or maintain[ing] the equilibrium of single or multiple components," Certain Fasteners from China and Taiwan at 9. Thus, Commerce determined that nails and screws have a comparable end use in that they are both used to hold different pieces together. Remand Results at 20. Plaintiffs would have Commerce expand the test for comparability to include factors such as "interchangeability of goods, channels of distribution, customer

Case 1:12-cv-00082-JAR   Document 41   Filed 03/22/18   Page 18 of 22

PUBLIC OPINION
Consol. Court No. 12-00065                                                    Page 18

perception, and manufacturing facilities" to test whether automotive fasteners and nails have comparable end uses. Pl. Cmts. at 28–29. Plaintiffs, however, offer no precedent or strong reasons for requiring consideration of these factors for this particular determination. Id.

Moreover, Plaintiffs cited decisions in three steel nails investigations, Oman, Taiwan, and Korea, decided after the POR as proof that automotive fasteners were not comparable to steel nails. Pl. Cmts. at 29–30. Upon closer examination, however, each case is distinguishable. While these decisions refer to Sundram's lower specificity, in only one, the Final Determination in Oman, were Sundram's financial statements rejected principally based on this factor.[17] In the other investigations, the decision not to use Sundram's financial statements was based, in part, on Sundram's lack of production in the subject countries, Taiwan[18] and Korea,[19] respectively.

---

[17] Certain Steel Nails From the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value, 80 Fed. Reg. 28,972 (May 20, 2015); Certain Steel Nails from the Sultanate of Oman: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value, A-523-808, POI 04/01/2013-03/31/2014 (Dep't Commerce May 13, 2015) ("Oman Final I&D Memo"). The company chosen to supply substitute financial information in this market economy case, Hitech Fastener Manufacture (Thailand) Co., Ltd., produced only steel screws. Oman Final I&D Memo at Comment 1. Commerce did, however, note that Sundram produced some merchandise comparable to that produced by the company examined. See id. The preliminary determination in this case likewise noted that Sundram produced some comparable merchandise, but declined to use its financial statements because Sundram neither produced nor sold this merchandise in Oman. Certain Steel Nails From the Sultanate of Oman: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 79 Fed. Reg. 78,034 (Dec. 29, 2014); Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation: Certain Steel Nails From the Sultanate of Oman, A-523-808, POI 04/01/2013-03/31/2014, at Part XIV.B (Dep't Commerce Dec. 17, 2014)

[18] In the final determination of this investigation, Commerce did not use Sundram's financial statements primarily because it had financial statements on record from companies that produced comparable merchandise in Taiwan. Certain Steel Nails From Taiwan: Final Determination of Sales at Less Than Fair Value, 80 Fed. Reg. 28,959 (May 20, 2015); Issues and Decision Memorandum for the Affirmative Final Determination in the Less than Fair Value Investigation of Certain Nails from Taiwan, A-583-854, POI 04/01/2013-03/31/2014, at Comment 1 (Dep't Commerce May 13, 2015). Likewise, in the preliminary determination, Commerce did not use any of the record data sets, and chose not to use Sundram because it does not sell or produce in

(continued…)

Case 1:12-cv-00082-JAR   Document 41   Filed 03/22/18   Page 19 of 22

PUBLIC OPINION
Consol. Court No. 12-00065                                          Page 19

The Court of International Trade opinion cited by Plaintiffs merely referenced <u>Certain Steel Nails From the Sultanate of Oman</u>, and made no judgment on Sundram's product comparability. The court simply noted Commerce's initial decision.[20]   All of the investigations cited by Plaintiffs acknowledge that Sundram produced a certain amount of goods comparable to the steel nails in question.

Notably, "Commerce [does] not rely on decisions made regarding comparability of merchandise from outside the period of review."  Commerce Response at 26.  Commerce may make different decisions at different times and they may all be supported.  Further, it would "defeat the whole purpose of having set periods of review for the administration of the antidumping order," <u>NSK Ltd. v. United States</u>, 510 F.3d 1375, 1381–82 (Fed. Cir. 2007) (concerning the inclusion of billing adjustments which occurred outside the period of review), if other records must also be considered.

Commerce weighed the three criteria, some of which were more persuasive than others, and found that Sundram's merchandise was sufficiently comparable to that of the NME producer, such that Sundram's financial statements could be averaged with those of Bansidhar.

---

Taiwan.  <u>Certain Steel Nails From Taiwan: Negative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,</u> 79 Fed. Reg. 78,053 at 9 (Dec. 29, 2014); <u>Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Certain Steel Nails from Taiwan</u>, A-583-854, POI 04/01/2013-03/31/2014, at Part VII.E (Dep't Commerce Dec. 17, 2014).

[19] <u>Certain Steel Nails From the Republic of Korea: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,</u> 79 Fed. Reg. 78,051 at 13 (Dec. 29, 2014); <u>Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation: Certain Steel Nails From the Republic of Korea</u>, A-580-874, POI 04/01/2013-03/31/2014, at Part XIV.B (Dep't Commerce Dec. 17, 2014).

[20] <u>Mid Continent Steel & Wire, Inc. v. United States</u>, 2017 Ct. Intl. Trade LEXIS 19, 23-25 (Ct. Int'l Trade Jan. 26, 2017) (referencing 80 Fed. Reg. 28,972).

Accordingly, the court concludes that Commerce's decision is supported by substantial evidence and is in accordance with law.

### IV.  Commerce's Decision to Apply Neutral Facts Available to Jinchi

In <u>Itochu</u>, the court held that Commerce improperly applied AFA to Jinchi for its failure to report FOP data from an unaffiliated supplier because Commerce never made a finding that Jinchi failed to cooperate.  <u>Id.</u> at *16.  Instead, record evidence showed that Jinchi continued to work with Commerce to provide the requested data.  <u>Id.</u>  The court also held that Commerce failed to conduct the necessary case-specific analysis to determine whether it was appropriate to apply an inference adverse to Jinchi for its unaffiliated supplier's failure to cooperate.  <u>Id.</u>

Accordingly, the court remanded the issue of whether application of AFA to the unaffiliated supplier was appropriate.  <u>Id.</u> at *17.  The court specifically directed Commerce to reconsider its application of a partial AFA margin to Jinchi for the missing information pertaining to Jinchi's unaffiliated supplier, [[          ]].  <u>Id.</u>  Commerce was given two options: (1) explain why application of AFA to Jinchi, a fully cooperating party, is appropriate; or (2) apply a neutral facts available margin to Jinchi.  <u>Id.</u> at *16.

On remand, Commerce acted within its discretion and reasonably applied neutral facts available to Jinchi.  Commerce found that:  (1) these hard cut nails represent an <u>insignificant</u> quantity of Jinchi's total quantity of subject merchandise sales to the U.S. during the POR (not a supermajority of the sales as initially thought); and (2) a majority of the other SVs are significantly lower than the value applied as AFA to Jinchi's hard-cut masonry nails.  <u>Remand Results</u> at 33–34.

Commerce noted in its <u>Final Results</u> that it "could have chosen to excuse Jinchi from reporting the sales and missing FOPs . . . from this unaffiliated supplier as an insignificant

CONFIDENTIAL INFORMATION OMITTED

Case 1:12-cv-00082-JAR   Document 41   Filed 03/22/18   Page 21 of 22

PUBLIC OPINION
Consol. Court No. 12-00065                                                    Page 21

quantity, if Jinchi [had] made such a request." Id. at 33. Commerce explained that because Jinchi did not ask to be excused, Commerce initially resorted to applying AFA. Id. Commerce failed to consider, however, that a reason Jinchi did not request this relief was because they were actively attempting to obtain the requested information from their supplier. See Pl. Cmts. at 7. Recognizing Jinchi's lack of success in this regard, Commerce sent its own questionnaire to the supplier. Remand Results at 31–32.

To further justify its original decision, Commerce cites Mueller Commercial de Mex., S. de R.L. de C.V. v. United States. Remand Results at 51–52. In that case, however, the supplier, Ternium, was also a potential mandatory respondent given its own high volume of exports to the United States. 753 F.3d 1227, 1229 (Fed. Cir. 2014). Due to this high volume, Commerce applied AFA as a negative incentive to induce Mueller's cooperation. Id. at 1235. In contrast, [[        ]] operations do not include any shipments to the United States, it is unable to provide financials to Commerce apparently because it does not have regular accounting, and it only employs 30 people, all facts which point to the insignificant size of [[        ]] operations. Second Administrative Review of Certain Nails from the People's Republic of China: Factors of Production for certain nails exported by Jinchi which were produced by [[

]], A-570-909, POR 08/31/2009-07/31/2010, at 2 and Attach.1 (Dep't of Commerce Sept. 28, 2011) ("FOP Letter"). Furthermore, Mueller makes clear that particular facts are necessary to apply AFA to a cooperating party based on a non-affiliated supplier's conduct. See 753 F.3d at 1233.

Turning to Commerce's new determination, given the insignificant amount of product involved, there is no likelihood of control by Jinchi or a motivation to evade as in Mueller, so factors that might warrant AFA based on a non-affiliate's conduct are missing. Id. at 1235. "If

the cooperating entity has no control over the non-cooperating suppliers, a resulting adverse inference is potentially unfair to the cooperating party." Id. (citing SKF USA Inc. v. United States, 630 F.3d 1365, 1375 (Fed. Cir. 2011)).

Mid Continent's argument that Jinchi had sufficient control over its supplier simply because it had an ongoing business relationship with the supplier, Def.-Int. Cmts. at 11, is unpersuasive. Under such a standard, it would be impossible to separate respondents who have control from those that do not. Mid Continent's assertion that [[        ]], as a rational business, would supply the records upon inducement by Jinchi ignores [[        ]] lack of proper accounting and small size.

Moreover, the evidence shows that Jinchi did in fact attempt to apply pressure to its producer. The record indicates that Jinchi actually tried to induce its supplier to provide the records, stating "[w]hether your company provides the help will influence our willingness to continue to do business with your company." FOP Letter, at Attach.1. That [[        ]] still refused to cooperate, arguing that "the requirements of the questionnaire [were] far beyond [its] ability," suggests Jinchi exercised insufficient control over the supplier to induce its cooperation. Id. For these reasons, the court concludes that Commerce's application of neutral facts on remand is supported by substantial evidence and is in accordance with law.

**CONCLUSION**

For the foregoing reasons, the court sustains Commerce's Remand Results.

    /S/   Jane A. Restani
      Jane A. Restani
          Judge

Dated:  March 22, 2018
        New York, New York